IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

NELLIE A. BALDRIDGE-MAYER                                           PLAINTIFF

v.                          NO. 1:18-cv-00063 PSH

NANCY A. BERRYHILL, Acting Commissioner                             DEFENDANT
of the Social Security Administration

## MEMORANDUM OPINION AND ORDER

Plaintiff Nellie A. Baldridge-Mayer ("Baldridge-Mayer") began this case by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, she challenged the June 29, 2018, final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon the February 26, 2018, findings of an Administrative Law Judge ("ALJ").

Baldridge-Mayer maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole.[1] Baldridge-Mayer so maintains for three reasons. Baldridge-Mayer maintains, inter alia, that the ALJ erred when he failed to give controlling weight to the medical opinions of her treating physician. Because it is not clear how the ALJ could weigh the opinions as he did, a remand to more fully develop the record is necessary.

---

[1] The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

Baldridge-Mayer alleged in her application for disability insurance benefits that she became disabled beginning on April 1, 2012. She alleged that she became disabled, in part, because of migraine headaches.

The record contains several hundred pages of evidence that touch in some way on Baldridge-Mayer's impairments and the extent to which they impact her residual functional capacity. She summarized the relevant evidence in her brief, and the Court accepts the summary as a fair summation of the evidence. The summary will not be reproduced in full, except to note several matters germane to the issues raised in the parties' briefs.

The issue in this case centers upon Baldridge-Mayer's migraine headaches and the extent to which they impact her residual functional capacity. She has complained of them for years and sought repeated medical attention for them. For instance, Baldridge-Mayer saw Dr. William Waldrip, M.D., ("Waldrip") on April 5, 2012, or four days after the alleged onset date, for complaints of blurred vision. See Transcript at 715-717. She reported a long history of headaches. She was taking Zomig for her headaches and doing so approximately fourteen times a month. She was instructed to take it no more than four times a month. He ordered an MRI of Baldridge-Mayer's brain, the results of which were unremarkable. See Transcript at 724.

Waldrip saw Baldridge-Mayer again on April 12, 2012. See Transcript at 712-713. They discussed the possibility that her blurred vision was a manifestation of her migraine headaches, but no conclusion was reached. She was continued on Zomig.

Waldrip saw Baldridge-Mayer next on April 18, 2012. In recording her history of present illness, he noted the following:

> … She tells me she is having about 10-15 headaches a month. These are the same type of headache she has always had, accompanied by nausea (and sometimes vomiting), photophobia and phonophobia. No other neurological symptoms are reported. She has been tried on numerous prophylactic medications in the past without success, including Topamax. She doesn't remember having tried Depakote, however. …

See Transcript at 709. He prescribed Depakote for her migraine headaches.

On April 23, 2012, Baldridge-Mayer established care with Dr. Tommy Taylor, M.D., ("Taylor"). See Transcript at 733-735. Although Baldridge-Mayer sought care primarily for blurred vision, she reported that she continued to have migraine headaches. A physical examination was unremarkable, and he continued her on Zomig.

On July 18, 2013, Dr. Ralph Mann, M.D., ("Mann") performed a consultative physical examination of Baldridge-Mayer. See Transcript at 767-772. She reported having migraine headaches fifteen to twenty times a month. He diagnosed headaches but made no findings with respect to the work-related limitations they cause. He simply assessed a moderate limitation in carrying, fingering, and handling.

On August 29, 2013, Baldridge-Mayer saw Dr. Beata Majewski, M.D., ("Majewski"). See Transcript at 784-794. Baldridge-Mayer's history of migraine headaches were noted. As a part of Majewski's notes, he opined the following: "[Baldridge-Mayer] has a cluster of depression, migraine headaches, and sleeplessness and unfortunately is intolerant to medications. …" See Transcript at 786.

On September 9, 2013, Baldridge-Mayer was seen by Dr. Garrett Sanford, M.D., ("Sanford"). See Transcript at 802-804. Sanford noted that Baldridge-Mayer had kept a daily log of her symptoms and recorded sixteen migraine headaches in August of 2013. He diagnosed, inter alia, migraine headaches.

On October 1, 2013, Baldridge-Mayer saw Dr. Thomas Kovaleski, M.D., ("Kovaleski"). See Transcript at 784-794. Baldridge-Mayer reported having approximately twenty migraine headaches a month. Kovaleski made no significant findings but did note that Baldridge-Mayer had multiple drug intolerances.

Baldridge-Mayer saw Kovaleski again on November 5, 2013. See Transcript at 818-819. Baldridge-Mayer continued to complain of migraine headaches and medication difficulties. Kovaleski observed that Baldridge-Mayer is "going to be a very difficult lady to have any significant impact." See Transcript at 818.

On May 6, 2015, Taylor signed a To Whom It May Concern letter on behalf of Baldridge-Mayer. See Transcript at 844. In the letter, Taylor represented that Baldrige-Mayer suffers from debilitating migraines that occur up to twenty times a month. It was his opinion that she also had a "low tolerance for medication." See Transcript at 844.

Baldridge-Mayer appears to have seen Taylor on three occasions between May 6, 2015, and November 10, 2015. See Transcript at 859-860 (05/06/2015), 860-862 (10/28/2015), 862-863 (11/10/2015). Baldridge-Mayer continued to complain of migraine headaches, which she reported having in excess of twenty times a month. She reported that Zomig was only partially effective in controlling her headaches.

On May 2, 2017, Taylor signed a residual functional capacity form on behalf of Baldridge-Mayer. See Transcript at 847-852. In it, Taylor represented the following:

> **Please describe the patient's symptoms as completely as possible:**
>
> [Baldridge-Mayer] reports about [twenty] migraines per month with associated nausea and visual disturbance. Headaches last from hours to days and only relieved by sleep.

4

> **Please state all clinical findings and any medical test results and/or laboratory results:**
>
> Multiple specialist visits and medications that have not had any alleviating effects.
>
> **What is your diagnosis of the patient's symptoms and test results?**
>
> Chronic migraines, fibromyalgia.
>
> **Please describe any treatment done so far and the results of treatment:**
>
> Depakote, Zomig.
>
> **What is your prognosis for this patient?**
>
> Unlikely to improve from baseline.

See Transcript at 847-848. Taylor opined that Baldridge-Mayer's migraine headaches and fibromyalgia prevent her from standing for six to eight hours, prevent her from sitting upright for six to eight hours, and require her to lie down during the day. He also opined that she can lift and carry less than five pounds. He did not believe she was capable of continuing, or resuming work at, her current or previous employment.

On May 18, 2017, Taylor signed a headache questionnaire on behalf of Baldridge-Mayer. See Transcript at 891-892. In it, Taylor represented that Baldridge-Mayer experiences about five migraine headaches a week, which last for about one to three days. The headaches are triggered, in part, by strong odors. When prompted to detail the positive test results and objective signs of Baldridge-Mayer's headaches, Taylor recorded the following: weight loss, tenderness, impaired sleep, impaired appetite or gastritis, a 1995 and 2012 MRI, and CT scans and EEG testing from the 1990s. He opined that she was incapable of performing even low stress jobs.

On December 5, 2017, Taylor signed a letter addressed to Baldridge-Mayer. In it, Taylor represented the following:

> As we have previously discussed, I am writing this letter to further document the debilitating nature of your migraine headaches. As you know, for many years you have had migraine headaches that are mainly triggered by dust, fumes, odors (i.e., Cleaners, perfumes/colognes, gasses), bright/flashing/flickering lights, sun glare, noise, emotional stress and extreme temperatures.
>
> When these headaches develop, a severe, throbbing, pulsating pain develops that can last for 4 to 72 hours (12 hours on average). They start with neck pain, aura that leads to nausea and vomiting and associated dizziness, light sensitivity, poor concentration, fatigue, and depression.
>
> Since you first consulted with me in April of 2012, no therapy has been successful in significantly improving your symptoms. As you know, this condition when coupled with several other co morbidities from which you suffer, including fibromyalgia, chronic vision problems, anxiety, extreme fatigue, and evidence of autoimmune disorder have made it impossible for you to maintain employment.

See Transcript at 893.

An assessment of Baldridge-Mayer's physical residual functional capacity was made by state agency physicians. See Transcript at 157-166, 167-179, 181-194. They agreed that she is capable of performing a reduced range of light work.

Baldridge-Mayer completed a series of reports in connection with her application for disability insurance benefits. In a pain report, Baldridge-Mayer represented that she experiences between ten to twenty migraine headaches a month, each headache lasting between one to three days. See Transcript at 515. She represented that her headaches are caused, in part, by strong pulmonary irritants such as fragrances and bleaches. Zomig helps relieve her symptoms, but she noted that she can only take Zomig four times a month.

Baldridge-Mayer testified during the administrative hearing. See Transcript at 60-104. She was born on January 1, 1962, and was fifty-six years old at the time of the hearing. She started having headaches as a child and started having "full blown migraines" as a teenager. See Transcript at 65. By the alleged onset date, she was experiencing fifteen to twenty migraine headaches a month. Her headaches are rarely less than eight hours in duration and can last as long as three days. Baldridge-Mayer has not sought emergency room treatment because she cannot afford to do so. A cold pack on her forehead and resting in a dark room help alleviate some of the symptoms. Although she has been prescribed Zomig and Imitrex, she has only taken Zomig intermittently because of its side effects. Pulmonary irritants, such as the scent of a candle, cause her to have headaches.

The ALJ found that Baldridge-Mayer last met the insured status requirement on March 31, 2016. The ALJ found at step two of the sequential evaluation process that Baldridge-Mayer's severe impairments include a history of migraine headaches. The ALJ found at step three that although "[t]here is no medical listing that corresponds to chronic migraines," see Transcript at 13, Baldridge-Mayer's impairments do not meet or equal a listed impairment. The ALJ then assessed Baldridge-Mayer's residual functional capacity and found that through the date last insured, she was capable of performing less than the full range of light, unskilled work. The ALJ additionally found that Baldridge-Mayer should have "no excessive exposure to dust, smoke, fumes, or other pulmonary irritants ..." See Transcript at 14. As a part of making the assessment, the ALJ gave "little weight" to Taylor's opinions." See Transcript at 16, 19. The ALJ did so for the following reasons:

> At the behest of [Baldridge-Mayer], … Taylor has submitted multiple letters stating he believes [Baldridge-Mayer's] migraines (among other symptoms) are debilitating. He has also filled out residual functional capacity … and headache forms that were printed out by [Baldridge-Mayer's] sister; these forms contemplate that [Baldridge-Mayer] is more limited than the conclusions reached by the [ALJ]. However, these letters and forms appear to be in conflict with … Taylor's earlier finding that [Baldridge-Mayer] alleged symptoms have a somatic basis, with little support from objective, clinical observation or evidence. … Taylor's letters and forms are retrospective in nature, and appear to rely heavily on [Baldridge-Mayer's] reporting of her symptoms. Because [Baldridge-Mayer] is no longer pursing treatment or taking any prescription medication, the [ALJ] is not persuaded by the findings of … Taylor, and gives them little weight.
>
> …
>
> As noted above, the [ALJ] acknowledges that … Taylor has indicated an opinion that [Baldridge-Mayer] is unable to work. However, the medical findings submitted by … Taylor (and otherwise documented in the record) do not support a finding that [Baldridge-Mayer's] medical condition is necessarily disabling. [Taylor] appears to have taken [Baldridge-Mayer's] subjective allegations at face value in making this assertion, one that does not necessarily take into account the other factors that must be considered by the [ALJ], such as the other medical reports and opinions as well as the vocational factors involved. [Taylor's] opinion has been considered but, in view of the overall record, is found not to be persuasive, and is given little weight. A treating physician's opinion may be discounted if unsupported by the evidence.

See Transcript at 16, 18-19. At step four, the ALJ solicited the testimony of a vocational expert. The ALJ found on the basis of the testimony that Baldridge-Mayer was capable of performing her past relevant work as a cashier and was therefore not disabled for purposes of the Social Security Act.

Baldridge-Mayer maintains that the ALJ erred in giving Taylor's medical opinions little weight. Baldridge-Mayer maintains that Taylor examined Baldridge-Mayer on several occasions and made "clinical observations relative to her migraine headaches." See Docket Entry 13 at CM/ECF 19.

A treating physician is "usually more familiar with a claimant's medical condition than are other physicians …" See Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991) [internal quotation omitted]. The treating physician's medical opinions are to be given controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are not inconsistent with the other substantial evidence. See Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006) (internal quotations omitted). The ALJ may discount the opinions, though, if other medical assessments are supported by better or more thorough medical evidence or where a treating physician renders inconsistent opinions. See Id.

On the record now before the Court, it is not clear how Taylor's opinions could be weighed as they were, and a remand is necessary in order to more fully develop the record. The Court so finds for the following reasons.

First, the ALJ discounted Taylor's medical opinions because they encroach upon a matter reserved exclusively for the ALJ. A medical opinion that an applicant is "disabled" or "unable to work" involves an issue reserved for the ALJ and is not the type of opinion entitled to controlling weight. See Ellis v. Barnhart, 392 F.3d 988 (8th Cir. 2005). Here, Taylor opined in more than one report that Baldridge-Mayer is incapable of continuing, or resuming work at, her current or previous employment. Those portions of his opinions could properly be disregarded because they touch upon an issue reserved for the ALJ. The remaining portions of Taylor's opinions, though, are not so tainted and should be weighed according to whether they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and whether they are not inconsistent with the other substantial evidence.

Second, the ALJ discounted Taylor's medical opinions because they rely upon Baldridge-Mayer's self-reports. A medical opinion may be discounted if it is based primarily upon an applicant's own complaints. See Winstrom v. Halter, 168 F.Supp.2d 1032 (D.Minn. 2001) [citing Woolf v. Shalala, 3 F.3d 1210 (8th Cir. 1993) (discounting opinion because it is based solely on claimant's complaints of pain)]. Migraine headaches and the work-related limitations they cause depend to a large extent upon the applicant's self-reports and are oftentimes not confirmed by medical testing. Here, the extent to which Taylor based his opinions upon Baldridge-Mayer's self-reports is unclear. What is clear is this: he examined her on several occasions and attempted to confirm them by medical testing. Moreover, Baldridge-Mayer was seen by other physicians, e.g., Waldrip, Majewski, Sanford, and Kovaleski, each of whom credited Baldridge-Mayer's complaints and diagnosed headaches.

Third, the ALJ discounted Taylor's medical opinions because they are inconsistent with Taylor's own notes. Specifically, the ALJ discounted Taylor's opinion that Baldridge-Mayer's migraine headaches are disabling because Taylor observed that Baldridge-Mayer's symptoms have a "somatic basis." See Transcript at 16. Medical opinions may be discounted if they are internally inconsistent. See Guilliams v. Barnhart, 393 F.3d 798 (8th Cir.2005). Here, the ALJ likely misinterpreted Taylor's observation. As Taylor noted in an August 7, 2018, To Whom It May Concern letter, "I could have said 'physical complaints,' 'bodily complaints,' or some other synonym. In no way was I trying to confer a diagnosis of a Somatoform Disorder which is a completely separate psychological condition. It sounds like, though, that this might have been how it was interpreted. That was not what was intended." See Transcript at 47.

Fourth, the ALJ discounted Taylor's medical opinions because they are not supported by objective medical evidence. It is axiomatic that medical opinions may be discounted if they are not well-supported by medically acceptable clinical and laboratory diagnostic techniques. Here, Taylor signed two letters, a residual functional capacity form, and a headache questionnaire in which he opined that Baldridge-Mayer's migraine headaches are chronic and severe, last several days, and dramatically impact her ability to perform work-related activities. See Transcript at 844 (To Whom It May Concern letter), 847-852 (residual functional capacity form), 891-892 (headache questionnaire), 893 (letter). Admittedly, his two letters and the residual functional capacity form are not supported by medically acceptable clinical and laboratory diagnostic techniques. Specifically, the results of a 2012 MRI were normal. However, the Court notes that an MRI cannot diagnose migraine headaches, but can help rule out other explanations for a patient's symptoms. Here, the MRI evidence proves nothing more than there is no physical or chemical abnormality causing Baldridge-Mayer's headaches. The dearth of objective medical evidence is not outcome determinative but is instead one factor to be considered in evaluating the existence and severity of her headaches.

Last, the ALJ discounted Taylor's medical opinions because they are inconsistent with the record as a whole. Medical opinions may be discounted if they are "inconsistent with other substantial evidence in [the] case record." See Choate v. Barnhart, 457 F.3d at 869. Here, the extent to which Taylor's opinions are inconsistent with the record as a whole is open to serious debate. Although Taylor's opinions are inconsistent with the results of Mann's consultative physical examination of Baldridge-Mayer and the findings

made by the state agency physicians, neither Mann nor the state agency physicians performed any medical testing. Mann, at least, examined Baldridge-Mayer; the state agency physicians did nothing more than review her medical records. Taylor's opinions are consistent with the findings and observations made by Waldrip, Majewski, Sanford, and Kovaleski, each of whom credited Baldridge-Mayer's complaints and diagnosed migraine headaches. Taylor's opinions are also consistent with Baldridge-Mayer's work history, which is sporadic at best; her use of prescription medication, which consisted primarily of Zomig; and her testimony during the administrative hearing.

The ALJ has an obligation to fully develop the record. See Battles v. Shalala, 36 F.3d 43 (8th Cir. 1994). There is no bright line test for determining whether the ALJ fully developed the record; the determination is made on a case by case basis. See Id. It involves examining whether the record contains sufficient information for the ALJ to have made an informed decision. See Pratt v. Asture, 372 Fed.Appx. 681 (8th Cir. 2010).

Here, it is not clear how Taylor's opinions could be weighed as they were. Substantial evidence on the record as a whole does not support the weight given his opinions, and a remand is necessary in order to more fully explore the bases of his opinions. Upon remand, the ALJ shall re-evaluate Taylor's opinions and, if necessary, obtain additional medical evidence from Taylor and/or Baldridge-Mayer's other physicians.[2] The ALJ shall then re-assess Baldridge-Mayer's residual functional capacity.

---

[2] Upon remand, the ALJ shall also evaluate Baldridge-Mayer's migraine headaches pursuant to Listing 11.02, which the Court accepts is the most closely analogous listing for migraine headaches. The Court finds that the ALJ erred when he failed to evaluate Baldridge-Mayer's headaches pursuant to Listing 11.02.

The Commissioner's decision is reversed, and this case is remanded. The remand in this case is a "sentence four" remand as that phrase is defined in 42 U.S.C. 405(g) and <u>Melkonyan v. Sullivan</u>, 501 U.S. 89 (1991).

IT IS SO ORDERED this 9th day of August, 2019.

_____
UNITED STATES MAGISTRATE JUDGE